**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Edward J. Gurule, | ) | No. CV 11-00976-PHX-NVW |
| | ) | |
| Plaintiff, | ) | **ORDER** |
| | ) | |
| vs. | ) | |
| | ) | |
| Michael J. Astrue, Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Edward J. Gurule seeks review under 42 U.S.C. §§ 405(g), 1383(c)(3), of the final decision of the Commissioner of Social Security ("the Commissioner"), which denied him disability insurance benefits and supplemental security income under the Social Security Act. Because the decision of the Administrative Law Judge ("ALJ") is supported by substantial evidence and is not based on legal error, the Commissioner's decision will be affirmed. Plaintiff's request for oral argument will be denied because the written briefing is sufficient and oral argument would not aid determination of the appeal. *See* Fed. R. Civ. P. 78(b); *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998).

**I.   Background**

**A.   Factual Background**

Gurule was born on November 17, 1967. When he was 12 years old, Gurule sustained a gun shot wound to his right ankle. In March 2007, he sought treatment for

1  pain and swelling in his right leg and continues to have chronic pain in his right leg and

2  ankle.  In addition, he is morbidly obese and has lower back pain, diabetes mellitus,

3  hypertension, and high cholesterol.

4       Gurule did not complete high school, but has a GED.  He previously worked as a

5  school cafeteria assistant and security guard, fast food restaurant assistant manager, and

6  general laborer.

7       **B.      Procedural History**

8       On April 16, 2007, Gurule protectively applied for disability insurance benefits,

9  and on April 24, 2007, he protectively applied for supplemental security income.  In both

10  applications he alleges disability beginning January 1, 2007.  The applications were

11  denied on initial review and again on reconsideration, after which Gurule requested that

12  his claim be heard by an ALJ.  On October 6, 2009, an administrative hearing was held at

13  which Gurule testified, but was not represented by counsel.[1]  Thomas M. Mitchell, Ph.D.,

14  an impartial vocational expert, also appeared at the hearing.  On March 3, 2010, the ALJ

15  issued his decision that Gurule was not disabled within the meaning of the Social Security

16  Act.

17       On March 18, 2011, the Appeals Council denied Gurule's request for review of the

18  ALJ's unfavorable decision, making that decision the final decision of the Commissioner.

19  On May 17, 2011, Gurule sought judicial review of the decision pursuant to 42 U.S.C.

20  §§ 405(g), 1383(c)(3).

21  **II.     Standard of Review**

22       The district court reviews only those issues raised by the party challenging the

23  ALJ's decision.  *See Lewis v. Apfel*, 236 F.3d 503, 517 n.13 (9th Cir. 2001).  The court

24  may set aside the Commissioner's disability determination only if the determination is not

25  _____

26       [1]Gurule was informed of his right to representation and stated that he understood his
    right to representation, but chose to proceed with the hearing without a representative.  On
27  May 13, 2010, present counsel was appointed to represent Gurule.

28                                        - 2 -

1   supported by substantial evidence or is based on legal error. *Orn v. Astrue*, 495 F.3d 625,

2   630 (9th Cir. 2007). Substantial evidence is more than a scintilla, less than a

3   preponderance, and relevant evidence that a reasonable person might accept as adequate

4   to support a conclusion considering the record as a whole. *Id.* In determining whether

5   substantial evidence supports a decision, the court must consider the record as a whole

6   and may not affirm simply by isolating a "specific quantum of supporting evidence." *Id.*

7   As a general rule, "[w]here the evidence is susceptible to more than one rational

8   interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be

9   upheld." *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002) (citations omitted).

10          The ALJ is responsible for resolving conflicts in medical testimony, determining

11   credibility, and resolving ambiguities. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir.

12   1995). In reviewing the ALJ's reasoning, the court is "not deprived of [its] faculties for

13   drawing specific and legitimate inferences from the ALJ's opinion." *Magallanes v.*

14   *Bowen*, 881 F.2d 747, 755 (9th Cir. 1989)*.*

15   **III.    Five-Step Sequential Evaluation Process**

16          To determine whether a claimant is disabled for purposes of the Social Security

17   Act, the ALJ follows a five-step process. 20 C.F.R. § 404.1520(a). If the ALJ determines

18   that the claimant is disabled or not disabled at any step, the ALJ does not continue to the

19   next step. The claimant bears the burden of proof on the first four steps, but at step five,

20   the burden shifts to the Commissioner. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir.

21   1999).

22          At the first step, the ALJ determines whether the claimant is engaging in

23   substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(I). If so, the claimant is not

24   disabled and the inquiry ends. *Id.* At the step two, the ALJ determines whether the

25   claimant has a "severe" medically determinable physical or mental impairment.

26   § 404.1520(a)(4)(ii). If not, the claimant is not disabled and the inquiry ends. *Id.* At step

27   three, the ALJ considers whether the claimant's impairment or combination of

28                                             - 3 -

1   impairments meets or equals an impairment listed in Appendix 1 to Subpart P of 20

2   C.F.R. Pt. 404. § 404.1520(a)(4)(iii). If so, the claimant is automatically found to be

3   disabled. *Id*. If not, the ALJ proceeds to step four. At step four, the ALJ assesses the

4   claimant's residual functional capacity and determines whether the claimant is still

5   capable of performing past relevant work. § 404.1520(a)(4)(iv). If so, the claimant is not

6   disabled and the inquiry ends. *Id*. If not, the ALJ proceeds to the fifth and final step,

7   where he determines whether the claimant can perform any other work based on the

8   claimant's residual functional capacity, age, education, and work experience.

9   § 404.1520(a)(4)(v). If so, the claimant is not disabled. *Id*. If not, the claimant is

10  disabled. *Id*.

11  **IV.   Analysis**

12          At step one, the ALJ found that Gurule has not engaged in substantial gainful

13  activity since January 1, 2007, the alleged onset date of disability. At step two, the ALJ

14  found that Gurule had the following impairments that are severe when they are

15  considered in combination: "he is status-post a gunshot wound (GSW) to the right ankle

16  with foot and ankle pain; and he has lower back pain; morbid obesity; diabetes mellitus;

17  hypertension; and high cholesterol." At step three, the ALJ found that Gurule did not

18  have an impairment or combination of impairments that met or medically equaled one of

19  the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

20          The ALJ determined that Gurule:

21          has the residual functional capacity to perform light work with restrictions
            as light work is defined in 20 CFR 404.1567(b) and 416.967(b). The
22          claimant is limited to unskilled work with the option to alternate at will
            between a sitting and standing position. The claimant is also precluded
23          from crawling, crouching, climbing, squatting, and kneeling; and cannot use
            the lower extremities for pushing or pulling.
24
25  At step four, the ALJ determined that Gurule is unable to perform any of his past relevant

26  work. At step five, the ALJ concluded that, considering Gurule's age, education, work

27

28                                              - 4 -

1  experience, and residual functional capacity, there are jobs that exist in significant

2  numbers in the national economy that Gurule could perform.

3          **A.**    **Subjective Symptom Testimony**

4             **1.**    **Legal Standard**

5        In evaluating the credibility of a claimant's testimony regarding subjective pain or

6  other symptoms, the ALJ is required to engage in a two-step analysis:  (1) determine

7  whether the claimant presented objective medical evidence of an impairment that could

8  reasonably be expected to produce some degree of the pain or other symptoms alleged;

9  and, if so with no evidence of malingering, (2) reject the claimant's testimony about the

10  severity of the symptoms only by giving specific, clear, and convincing reasons for the

11  rejection.  *See Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009).[2]  To support a lack of

12  credibility finding, the ALJ is required to point to specific facts in the record that

13  demonstrate that Gurule's symptoms are less severe than he claims.  *Id.* at 592.  "Factors

14  that an ALJ may consider in weighing a claimant's credibility include reputation for

15  truthfulness, inconsistencies in testimony or between testimony and conduct, daily

16  activities, and unexplained, or inadequately explained, failure to seek treatment or follow

17  a prescribed course of treatment."  *Orn v. Astrue*, 495 F.3d 625, 636 (9th Cir. 2007)

18  (internal quotation marks and citations omitted).

19        To be found credible regarding subjective pain or fatigue, a claimant is not

20  required to:  (1) produce objective medical evidence of the pain or fatigue itself, or the

21  severity thereof; (2) produce objective medical evidence of the causal relationship

22

23      [2]Contrary to the Commissioner's contention, *Bunnell v. Sullivan*, 947 F.2d 341 (9th
Cir. 1991), does not permit finding subjective symptom testimony not credible without

24  articulating clear and convincing reasons.  The Commissioner correctly quotes *Bunnell* as
stating an ALJ must make specific findings, supported by the record, to support his

25  conclusion that a claimant's allegations of severity are not credible.  *See id.* at 345.  But

26  *Bunnell* does not address whether the reasons must be clear and convincing.  Rather, it
addresses whether an ALJ may discredit a claimant's allegations of the severity of pain solely

27  on the ground that the allegations are unsupported by objective medical evidence.

28

between the medically determinable impairment and the symptom; or (3) show that his impairment could reasonably be expected to cause the severity of the alleged symptom, only that it could reasonably have caused some degree of the symptom. *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996).

### 2. The ALJ Did Not Err by Finding Gurule's Subjective Symptom Testimony Not Fully Credible.

Gurule contends that the ALJ erred by failing to set forth specific, clear, and convincing reasons to reject Gurule's testimony about the severity of his subjective symptoms. When Gurule applied for Social Security benefits, he said that he was unable to work because he had constant pain and swelling in his right leg and could not walk. He reported that he had very bad pain in both feet and legs so that he could not get out of bed and could not walk for weeks at a time. He also reported that doctors had no explanation for his pain except for his weight. He reported that he lives with his parents and does not prepare meals, do any household chores, does not drive, and does not shop. He said that his drivers license had been taken away because of his poor eyesight caused by diabetes. Further, he reported that he is not able to pay bills, count change, handle a savings account, or use a checkbook or money orders because of his poor eyesight and poor math skills. He also reported that he does not follow written instructions well, has difficulty following spoken instructions, does not get along with authority figures, and does not handle stress well. He reported that fourteen years before his application for benefits he was prescribed a cane, brace/splint, wheel chair, and crutches, which he uses almost all of the time. He also reported that three years before application he was prescribed eye glasses.

At the administrative hearing, Gurule testified that the longest he can stand at one time is four or five minutes and the longest he can sit is 20-30 minutes. After that, he needs to lie down. He said that he stopped working because of pain in his ankle, legs, and back. He also testified that his drivers license was suspended for driving without his

1   glasses.  He said he has pain in his right foot, ankle, and leg due to bullet fragments from

2   a hunting accident and rheumatoid arthritis.  He testified that he has low back pain,

3   numbness in his right hand, and beginning glaucoma.  He said that his vision problems

4   began two or three years before, he had glasses that were in his car when it was stolen,

5   and he has not replaced the glasses because he prefers not to drive and his uncontrolled

6   diabetes makes it difficult to prescribe glasses for effective vision correction.  He said that

7   the back pain is caused by rheumatoid arthritis.

8          The ALJ made numerous, specific findings related to Gurule's credibility:

9          The claimant testified that he has experienced arthritic pain in his right
           ankle ever since he was shot in the right leg.  He testified that there are still
10         bullet fragments in his leg that cause him to be in pain.  The claimant also
           reports that he experiences numbness in his right foot and ankle; and that
11         sometimes his entire right leg swells up to the middle of his knee [].  He
           further testified that he has back pain and that he has recently gained about
12         100 pounds which negatively contributes to his overall physical condition.  .
           . .
13
           As a result of these symptoms, the claimant reports that he is unable to lift
14         and carry most items.  He also reports that he is in too much pain to
           complete chores or errands; and that he even has difficulty caring for his
15         personal needs such as bathing and using the toilet.  The claimant also
           reports that he needs to use a cane, crutches, or wheelchair to move around.
16         Furthermore, the claimant reports that his pain interferes with his ability to
           sleep, as well as his ability to maintain his focus and cope with stressful
17         situations [].

18         . . . .

19         The record reveals that the claimant's history of GSW to the right ankle is
           not so severe so as to preclude him from working.  Although the claimant
20         sustained a GSW at the age of 12, the claimant was infrequently treated for
           this condition for many years [].  In March 2007, PBH healthcare providers
21         noted that despite the claimant's right lower extremity edema, the claimant
           exhibited minimal calf tenderness and showed excellent pulses [].  Shortly
22         thereafter in July 2007, consultative examiner Dr. Nadir noted that the
           claimant was able to tandem walk and show a full range of motion in the
23         lower extremities.  The claimant also showed no inflamed joints, swelling,
           or edema at this time; and he was able to ambulate with no assistive device
24         [].

25         Dr. Cunningham made similar observations the following year with regard
           to the claimant's right lower extremity condition.  . . . .
26
           With regard to the claimant's back, Dr. Nadir also noted that the claimant
27         showed a full range of motion.  The claimant's straight-leg-raising test was

28                                    - 7 -

also negative at this time, and the claimant showed no evidence of spasm in the back []. . . . .

The claimant's diabetes mellitus is also not as severe as the claimant alleges. Although the claimant showed some decreased foot sensation in July 2007, Dr. Nadir also noted that the claimant showed normal sensation in the upper extremities []. Furthermore, the following year, Dr. Cunningham noted that the claimant showed intact sensation in both the upper extremities and feet. In fact, Dr. Cunningham concluded that the claimant showed no evidence of diabetic neuropathy. The claimant's blood sugar was also well-controlled at this time [].

Finally, the claimant's hypertension and high cholesterol are not as severe as the claimant alleges. There is little evidence in the record that suggest that these conditions could result in disabling impairments to the claimant. Indeed, the claimant's blood pressure has been measured within normal limits on multiple occasions []. . . . .

. . . .

. . . [T]he undersigned also partially credits the testimony and allegations of the claimant with regard to his overall body pain. The effect of the claimant's obesity on his overall ability to function has also been considered. The claimant has continued to gain weight over the past several years. This weight gain has likely exacerbated his other physical conditions and has contributed to his pain and discomfort, especially with regard to his use of the lower extremities. Accordingly, the above residual functional capacity gives the claimant the benefit of the doubt, and limits the claimant to a light range of unskilled work as indicated above.

However, the undersigned does not fully credit the testimony and allegations of the claimant. As discussed above, the record reveals that the claimant's impairments are not as severe as he alleges. Although the claimant claims that he needs a cane, crutches, or a wheelchair to move around, consultative examiners Dr. Nadir and Dr. Cunningham both noted that the claimant was able to ambulate without any assistive device. Furthermore, Dr. Cunningham described the claimant's lower extremity exam as "inconsistent" and concluded that the claimant had shown limited effort during this portion of the examination []. This strongly suggests that the claimant may have been attempting to exaggerate his symptoms. For these reasons, the claimant's credibility is negatively affected.

Thus, the ALJ did not reject Gurule's subjective symptom testimony entirely, and he provided specific, clear, and convincing reasons for partially rejecting Gurule's testimony about the severity of his symptoms.

1

**B.     Listing 2.00**

2      Gurule contends that the ALJ should have granted benefits at step three of the

3 sequential evaluation process because his vision impairment establishes disability

4 pursuant to Listing 2.00.  Listing 2.00 explains how visual disorders, including statutory

5 blindness, are evaluated and what evidence is needed to establish statutory blindness and

6 other visual disorders.  20 C.F.R. pt. 404, subpt. P, app. 1 listing 2.00.  The Social

7 Security Act defines blindness as visual acuity of 20/200 or less in the better eye with the

8 use of a correcting lens.  To establish a vision impairment under Listing 2.00, Gurule was

9 required to submit evidence that his vision in his better eye after best correction was

10 20/200 or less.

11      On July 5, 2007, consultative examiner Ehreema Nadir, M.D., tested Gurule's

12 vision using a Snellen chart.  Dr. Nadir reported Gurule's vision as 20/200 in each eye

13 with corrective lenses.  Although Dr. Nadir's report indicates that Gurule's vision was

14 tested with corrective lenses, it does not indicate that it was tested using best correction.

15      On October 9, 2007, state agency ophthalmologist Warren H. Heller, M.D.,

16 evaluated Gurule's eyes and vision.  Dr. Heller reported Gurule's vision as 20/400 in each

17 eye without glasses.  He further reported that Gurule did not have glasses, but with

18 correction his vision was 20/50 and 20/70.  His eyes were normal without evidence of

19 glaucoma or retinal disorder.

20      On July 9, 2008, consultative examiner Keith Cunningham, M.D., found no visual

21 limitation and noted that Gurule reported having gained weight "sitting around home,

22 watching TV."  No doctor noted observing that Gurule had functional limitations because

23 of impaired vision.  In fact, Dr. Nadir opined that Gurule should "be able to sit at a desk

24 job and do work."  At the administrative hearing, Gurule testified that he could get his

25 suspended drivers license back if he paid the fine for driving without glasses.  He also

26 testified that he can read newspapers and magazines using his "good eye."

27

28

1    Thus, the only evidence of Gurule's optimal visual acuity attainable with the use of

2    a corrective lens is 20/50 and 20/70.  After considering the evidence, the ALJ stated that

3    he had carefully considered all sections of the Listing of Impairments in concluding that

4    Gurule did not have an impairment or combination of impairments that meets or

5    medically equals a Listing.  He did not err by not granting Gurule benefits at step three of

6    the sequential evaluation process based on Listing 2.00.

7         **C.      Duty to Develop the Record**

8    Gurule contends that the ALJ failed to perform his duty to develop the record

9    and/or advise Gurule that the record was not developed and that the ALJ was required to

10   be especially diligent because of Gurule's lack of representation at the administrative

11   hearing.  *See McLeod v. Astrue*, 640 F.3d 881, 885 (9th Cir. 2011).  When a claimant

12   appears at an administrative hearing without counsel, the ALJ must probe and inquire for

13   all the relevant facts, but lack of counsel does not affect the validity of the hearing unless

14   the claimant demonstrates prejudice or unfairness in the administrative proceedings.  *Key*

15   *v. Heckler*, 754 F.2d 1545, 1551 (9th Cir. 1985).

16   The ALJ asked Gurule whether he wanted to proceed without a representative, and

17   Gurule responded, "At this point, yes."  But then Gurule asked if he could get an

18   extension if he needed to get a lawyer.  The ALJ said, "If you tell me that you want to get

19   a lawyer, then we'll have to postpone the hearing and reschedule it.  So you tell me what

20   you want to do."  Gurule said, "I think I do want to get a lawyer."  The ALJ questioned

21   him regarding why he did not already have a lawyer, and Gurule said that he had been

22   trying to get one for the past month.  The ALJ asked why he had not attempted to get one

23   when he requested the hearing more than a year before.  Gurule said that he had new

24   injuries and he had been "trying to get the doctors and all that to get on the same page so I

25   can get help from a lawyer."  Then, the following discussion took place:

26         ALJ:  So what you're telling me is that you want to have a
           postponement then so that you can have time to get a lawyer.  Is that what

27

28                                      - 10 -

you're telling me?  I just need to know what you need – what you want to do?

        CLMT:  Let's proceed.  Let's proceed.

        ALJ:  No, I'm not going – I'm just saying, if you want to have a postponement, you can have one.

        CLMT:  Because this has been dragging on long enough already so I've got to get, one way or the other I've got to do something to help myself so we can go ahead.  I'll work it myself.

        ALJ:  All right.  Well, then, you know, I just want to make sure that you understand –

        CLMT:  Yes, sir, uh-huh.

        ALJ:  – that you can't have a postponement once we get going now –

        CLMT:  Yes, sir, I understand.

Thus, Gurule was given opportunity to postpone the administrative hearing to obtain counsel, but chose to proceed without representation.  Gurule does not contend that he was prejudiced by the lack of counsel or that the administrative hearing was unfair.

      Gurule contends that the ALJ should have further developed the record by obtaining current treatment records, ordering a consultative vision examination, contacting treating physicians regarding their opinion of Gurule's residual functional capacity, and eliciting third-party reports.  The ALJ's duty to conduct further inquiry is triggered by ambiguous evidence or the ALJ's finding that the record is inadequate to permit proper evaluation of the evidence.  *McLeod*, 640 F.3d at 885.

      Here, the evidence is not ambiguous, and the record is adequate to permit proper evaluation of the evidence.  Gurule's corrected vision in the better eye is 20/50.  He was not diagnosed during the relevant period with diabetic retinopathy.  The only medical record indicating possible diabetic neuropathy stated that he had some decreased sensation in his feet even though he reported both "constant pain" and "constant numbness" in the soles of his feet.  He has not consistently sought treatment or

medication for his leg and back pain.  Although he frequently refers to himself as having

rheumatoid arthritis, he has not been diagnosed with that condition.

Further, Gurule does not identify any current treatment records that would have

assisted the ALJ in assessing his residual functional capacity from January 1, 2007, to

October 6, 2009.  Instead, he has attached to his opening brief two medical reports from

October 5, 2010, and September 26, 2011, long after the administrative hearing on

October 6, 2009.  The October 5, 2010 report states that Gurule's vision was 20/200 in

both eyes without corrective lenses.  The September 26, 2011 report states that Gurule

reported a two-year history of bilateral lower-leg numbness, tingling, pain, and weakness.

Neither report helps Gurule's case.  Moreover, the record before the ALJ did include a

consultative vision examination.  Therefore, the ALJ did not fail to perform his duty to

develop the record.

Gurule further contends that the ALJ erred by failing to ask the vocational expert

whether his opinion was consistent with the Dictionary of Occupational Titles ("DOT").

Social Security Ruling 00-4p states:

> When there is an apparent unresolved conflict between [vocational
> consultant] evidence and the DOT, the adjudicator must elicit a reasonable
> explanation for the conflict before relying on the [vocational consultant]
> evidence to support a determination or decision about whether the claimant
> is disabled.  At the hearings level, as part of the adjudicator's duty to fully
> develop the record, the adjudicator will inquire, on the record, as to whether
> or not there is such consistency.

Here, there was no apparent unresolved conflict between the vocational expert's evidence

and the DOT, but the ALJ failed to inquire on the record whether there was a conflict.  In

his hearing decision, the ALJ stated that the vocational expert's testimony is consistent

with the information contained in the DOT, but did not explain the basis for his finding.

In his opening brief, Gurule did not contend that there is, in fact, an unresolved conflict

between the vocational expert's evidence and the DOT, only that the ALJ committed a

procedural error.  In his reply brief, Gurule states that a sit/stand option conflicts with the

DOT and requires vocational testimony.  However, the ALJ specifically elicited

1  vocational testimony regarding how much the sit/stand option reduced the numbers of the

2  representative jobs that Gurule could perform, *i.e.*, cashiering, assembly, and security

3  positions.  Thus, the ALJ erred by failing to inquire on the record whether there was a

4  conflict, and if so, what was the basis for the vocational expert's opinion, but the error is

5  harmless and remand is not warranted.

6  **D.    Residual Functional Capacity**

7  Gurule contends the ALJ erred by failing to provide an individualized residual

8  functional capacity assessment as required by Social Security Ruling 96-8p.  A claimant's

9  residual functional capacity is "what an individual can still do despite his or her

10  limitations."  Social Security Ruling 96-8p.  The residual functional capacity

11  determination is "a function-by-function assessment based upon all of the relevant

12  evidence of an individual's ability to do work-related activities."  *Id.*

13  The hearing decision states:

14  [T]he claimant has the residual functional capacity to perform light work
   with restrictions as light work is defined in 20 CFR 404.1567(b) and
15  416.967(b).  The claimant is limited to unskilled work with the option to
   alternate at will between a sitting and standing position.  The claimant is
16  also precluded from crawling, crouching, climbing, squatting, and kneeling;
   and cannot use the lower extremities for pushing or pulling.
17
18  This residual functional capacity assessment incorporates the specific functional

19  limitations of the definition of "light work" with additional specific functional limitations.

20  Gurule's primary complaint is that the ALJ did not make an individualized

21  determination because he used a "blanket routine hypothetical" that does not address

22  Gurule's entire medical record and did not consider all of his impairments in

23  combination.  However, he does not contend that the residual functional capacity

24  assessment needed to include limitations for diabetes, hypertension, or high cholesterol,

25  and the record does not show any basis for limitations based on his need for corrective

26  lenses.  Considering these conditions in combination with his low back pain, foot and leg

27  pain, and obesity does not result in a different residual functional capacity assessment.

28

Gurule's residual functional capacity assessment provides limitations required by his low back pain, foot and leg pain, and obesity, and there is no evidence that Gurule's obesity in combination with his other impairments would cause him to be too fatigued to work full-time.

IT IS THEREFORE ORDERED affirming the final decision of the Commissioner of Social Security denying Gurule disability benefits.

IT IS FURTHER ORDERED that the Clerk enter judgment in favor of Defendant against Plaintiff and that Plaintiff take nothing.  The Clerk shall terminate this action.

DATED this 19th day of April, 2012.

_____
Neil V. Wake
United States District Judge

- 14 -